**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

NANCY YELINEK,            )
                           )
        Plaintiff,       )
                           )     Civil Action No. 20-799
        v.               )     Judge Nora Barry Fischer
                           )
                           )
JOHNSON & JOHNSON; ETHICON INC., )
                           )
        Defendants.    )

## <u>MEMORANDUM OPINION</u>

### I. INTRODUCTION

Plaintiff Nancy Yelinek sued Defendants Johnson & Johnson and Ethicon Inc. for injuries allegedly sustained from a mesh product implanted in Yelinek to treat a parastomal hernia. (Docket No. 55 ¶ 1). Presently before the Court are Defendants' Motion for Summary Judgment, (Docket No. 52), Yelinek's Brief in Opposition, (Docket No. 57), and Defendants' Reply, (Docket No. 60). After careful consideration of the parties' positions and for the following reasons, Defendants' Motion [52] is granted.

### II. FACTUAL BACKGROUND

The factual background derives from the undisputed evidence in the record, and any disputed evidence is viewed in the light most favorable to Yelinek as the non-moving party. The record consists of Yelinek's medical records, her deposition testimony, and the deposition testimony of two physicians who provided her medical care: Dr. Brent Angott and Dr. David Medich.

### A. Yelinek's Interstitial Cystitis Diagnosis and Pre-2008 Treatment

Yelinek suffered from interstitial cystitis. Interstitial cystitis is a chronic condition that causes pain and dysfunction in the bladder. (Docket 55 ¶ 4 n.2). Yelinek described interstitial cystitis as a "disease of the bladder that eats the bladder away." (Docket No. 54-4 at 19). She testified that her interstitial cystitis symptoms included "burning," "numbness," and frequent visits to the restroom. (Docket No. 54-4 at 19). She estimated that she first began suffering from interstitial cystitis in the "mid to late '90s." (Docket No. 54-4 at 19). At first, she was visiting the restroom twenty to thirty times per day. (Docket No. 54-4 at 19). As time went on, her bladder was "shrinking and hardening," to the point where her bladder could only hold "six to eight ounces." (Docket No. 54-4 at 19). At the height of her symptoms, she visited the restroom sixty to seventy times per day. (Docket No. 54-4 at 19). She could not recall if anyone discovered a cause for her interstitial cystitis diagnosis. (Docket No. 54-4 at 19).

After several unsuccessful treatments for interstitial cystitis, Yelinek testified that she underwent an "ileal conduit urinary diversion" procedure. (Docket No. 54-4 at 22). Ileal conduit urinary diversion is a technique in which a medical professional "creates a new passage for urine to leave the body by taking a small piece of the patient's intestine and forming it into a conduit" that "connect[s] the ureters to a stoma, or opening, in the lower abdomen, [thus] bypassing the bladder." (Docket No. 55 ¶ 4 n.2). According to Yelinek's medical records, Dr. Shirish Desai performed the ileal conduit urinary diversion on October 4, 2007 to address Yelinek's "severe intractable interstitial cystitis." (Docket No. 54-2 at 2). The procedure involved creating a stoma in Yelinek's abdomen. (Docket No. 54-2 at 2). Yelinek explained that the stoma was placed on the right side of her abdomen. (Docket No. 54-4 at 22; Docket No. 55 ¶ 4). Yelinek's medical records and her testimony reveal that at some point after the 2007 procedure, Yelinek developed a "large parastomal hernia" next to her stoma on the right side of her abdomen. (Docket No. 54-4 at 22-23;

Docket No. 54-5 at 2; Docket No. 54-6 at 2). A parastomal hernia is an expansion of a surgically-made defect in the muscle that can occur when a stoma is created in a person's abdomen. (Docket No. 54-7 at 7).

### B.  The July 10, 2008 Surgery

In response to the parastomal hernia, Dr. Firooz Taghizadeh performed surgery to move the stoma on July 10, 2008. (Docket No. 54-4 at 23; Docket No. 54-1 at 2). In Yelinek's medical records, Dr. Taghizadeh recorded that he moved the stoma from the right side of Yelinek's abdomen to her left side. (Docket No. 54-1 at 2; Docket No. 55 ¶ 6). He recorded that the "[s]mall bowel and also cecum herniated through the peristomal hernia." (Docket No. 54-1 at 2). Dr. Taghizadeh reduced the hernia and mobilized the small bowel. (Docket No. 54-1 at 2). He then repaired the herniated site by reinforcing the fascia "with application of Prolene soft mesh," which he "sutured to [the] fascia." (Docket No. 54-1 at 2). Yelinek could not recall Dr. Taghizadeh speaking to her about using mesh to repair the site of the hernia on the right side of her abdomen. (Docket No. 54-4 at 23). All she could recall him saying was that "he was going in to repair" the herniated area. (Docket No. 54-4 at 23). Yelinek also made clear that the July 10, 2008 surgery was her "first ever hernia-related procedure." (Docket No. 54-4 at 23). On July 19, 2008, nine days after surgery, Dr. Taghizadeh recorded that Yelinek was in "good condition," was walking, and had a regular diet. (Docket No. 54-5 at 2). Yelinek did not recall conducting post-operation visits with Dr. Taghizadeh after the July 10, 2008 surgery. (Docket No. 54-4 at 24).

After the July 10, 2008 procedure with Dr. Taghizadeh, Yelinek began to experience a burning sensation on the "insides of [her] stomach" and could feel "pinching at certain points" inside of her stomach. (Docket No. 54-4 at 24). While she could not remember exactly when the symptoms began after the July 10, 2008 surgery, she made clear that this burning sensation was

not the "normal burning sensations from surgery." (Docket No. 54-4 at 25). Rather, the symptoms

occurred "after [she was] up and moving and everything," not "immediately after" the surgery.

(Docket No. 54-4 at 25). Later in her deposition, she estimated that the symptoms began "a month

or so" after the July 10, 2008 surgery. (Docket No. 54-4 at 25). An investigation of her symptoms

revealed that she had developed another hernia at the original location of the stoma on the right

side of her abdomen. (Docket No. 55 ¶ 7). She had also developed a new parastomal hernia at the

new site of the stoma on the left side of her abdomen. (Docket No. 55 ¶ 7).

### C.  The December 12, 2008 Surgery

On December 12, 2008, Dr. Brent Angott performed surgery to repair the two new hernias.

(Docket No. 55 ¶ 8). In Yelinek's medical records, Dr. Angott recorded that he encountered a

"ventral hernia" at the "previous stoma site." (Docket No. 54-8 at 2; Docket No. 54-3 at 6).

According to Dr. Angott, a ventral hernia is "any hernia on the anterior abdominal wall." (Docket

No. 54-3 at 15). Dr. Angott testified that his customary practice for surgeries, and the practice he

undertook during Yelinek's December 12, 2008 surgery, was to explain to the patient what he

intended to accomplish with the surgery. (Docket No. 54-3 at 13). Consistent with Dr. Angott's

testimony, Yelinek testified that Dr. Angott explained "what needed to be done and why." (Docket

No. 54-4 at 24). Regarding the diagnoses Dr. Angott gave her, Yelinek testified as follows: "He

said that the mesh did - - it wasn't - - the mesh didn't hold up, it didn't work, whatever, I don't

recall the exact words, but he said that it didn't work, it didn't hold up and he was to go in and

repair." (Docket No. 54-4 at 24). Later in her deposition, Yelinek again described her conversation

with Dr. Angott leading up to the December 12, 2008 surgery. Yelinek testified that Dr. Angott

told her that "the previous [mesh] did not hold. It was, like, in a ball inside of me, that it did not

adhere." (Docket No. 54-4 at 27). In Yelinek's medical records, Dr. Angott recorded that after

repairing the ventral hernia, he removed the "mesh that was located on the side that blew out from this previous hernia repair." (Docket No. 54-8 at 2; Docket No. 54-3 at 7). In his deposition, Dr. Angott explained that the phrase "blew out" in the records meant that the ventral hernia repaired on July 10, 2008 by Dr. Taghizadeh had reoccurred and "pushed the mesh over to the side of the actual hernia." (Docket No. 54-3 at 13).

After removing the mesh, Dr. Angott attached a "3x6 piece of polypropylene" mesh on the site of the now-repaired ventral hernia. (Docket No. 54-8 at 2). Yelinek's medical records reveal that Dr. Angott used "Bard Mesh" on the right side of Yelinek's abdomen to repair the ventral hernia. (Docket No. 54-9 at 2).[1] Dr. Angott testified that after performing a surgery, he would explain what he accomplished during the surgery to the patient. (Docket No. 54-3 at 8, 13, 14). In her deposition, Yelinek confirmed that Dr. Angott told her that he "removed mesh and then he also used mesh during [the December 12, 2008] procedure." (Docket No. 54-4 at 24).[2] Yelinek also remembered conducting post-operation visits with Dr. Angott. (Docket No. 54-4 at 24).

### D. Post-2008 Complications and Surgeries

Yelinek's medical problems continued after her 2008 surgeries. On April 14, 2010, Dr. Angott repaired a parastomal hernia that developed on Yelinek's left abdomen near the site of the stoma. (Docket No. 54-10 at 2; Docket No. 54-3 at 9). On October 17, 2014, Dr. Angott repaired a parastomal hernia on the left side of Yelinek's abdomen and a ventral hernia on the right side of Yelinek's abdomen. (Docket No. 54-11 at 2). Dr. Angott also separated a piece of mesh from

---

[1]     Yelinek explained that she did not know who manufactured the mesh that Dr. Taghizadeh used during the July 10, 2008 procedure. (Docket No. 54-4 at 24). She also never learned what type of mesh Dr. Angott used during the December 12, 2008 surgery. (Docket No. 54-4 at 24).

[2]     Yelinek noted that "I don't know that he got . . . all [the mesh] because I've had multiple surgeries and I remember them going back in and - - and removing mesh, you know, [at] different times." (Docket No. 54-4 at 24).

Yelinek's bowel on the right side of her abdomen. (Docket No. 54-3 at 18-19). During the course of the October 17, 2014 procedure, Dr. Angott repaired a tear in Yelinek's bowel. (Docket No. 54-3 at 16). On April 15, 2015, Dr. Angott performed surgery to remove infected mesh from a hernia that had developed on the right side of Yelinek's abdomen. (Docket No. 54-12 at 2). On August 23, 2015, Dr. David Medich performed surgery on Yelinek to repair an "enterocutaneous fistula" and partial bowel obstruction. (Docket No. 54-13 at 2). Dr. Medich explained that an enterocutaneous fistula, at least in Yelinek's case, is a connection of the small bowel with the skin, meaning small bowel content could escape the bowel and leak onto Yelinek's anterior abdominal wall. (Docket No. 54-7 at 8). After her August 23, 2015 surgery, Yelinek had two additional surgeries in 2016 related to her enterocutaneous fistula. (Docket No. 54-7 at 12-14).

### E.  Yelinek's Decision to Sue

In her deposition, Yelinek stated that she got the idea to sue Defendants when she saw a television commercial about recalled mesh products. (Docket No. 54-4 at 33). She said that she could not remember the year when she saw the commercial. (Docket No. 54-4 at 33). Later in the deposition, however, she indicated that she had considered filing a lawsuit prior to seeing the commercial. (Docket No. 54-4 at 34). In her "fact sheet," filed as part of her suit, Yelinek stated that she was "not sure when she first attributed her injuries to the . . . mesh product." (Docket No. 8 at 7). She continued, "Sometime during her treatment for one of the multiple infections, she remembers someone mentioning that the mesh could have contributed to the infections, but [she] cannot recall which provider or when this may have happened." (Docket No. 8 at 7).

When asked why she filed her lawsuit against Defendants, Yelinek explained that the July 10, 2008 surgery "triggered all the other effects of everything else, all of the MRSAs and the

fistulas and everything; it, you know, contributed to all of that. I have all the scar tissue, so I've had bowel blockages, different things and stuff, also, so." (Docket No. 54-4 at 33).

### III. PROCEDURAL HISTORY

Yelinek joined a multi-district litigation action pending in the Southern District of West Virginia by filing a short-form complaint on October 3, 2017. (Docket No. 1). She alleged that "Prolene soft mesh" was implanted into her on July 10, 2008 at Uniontown Hospital in Uniontown, Pennsylvania by Dr. Firooz Taghizadeh. (Docket No. 1 at 3-4). In her complaint, Yelinek sued Defendants for the following counts: (1) Negligence, (2) Strict Liability – Manufacturing Defect, (3) Strict Liability – Failure to Warn, (4) Strict Liability – Defective Product, (5) Strict Liability – Design Defect, (6) Common Law Fraud, (7) Fraudulent Concealment, (8) Constructive Fraud, (9) Negligent Misrepresentation, (10) Negligent Infliction of Emotional Distress, (11) Breach of Express Warranty, (12) Breach of Implied Warranty, (13) "Violation of Consumer Protection Laws," (14) Gross Negligence, (15) Unjust Enrichment, (16) Punitive Damages, and (17) "Discovery Rule and Tolling." (Docket No. 1 at 4-5).

By filing her complaint, Yelinek joined an MDL action in which numerous plaintiffs sued because of injuries arising from "pelvic mesh." (Docket No. 19-1 at 4). Various pelvic mesh products created by various entities had been used to treat "pelvic organ prolapse and stress urinary incontinence." (Docket No. 4). As the parties stipulated to the Court, Yelinek's suit should not have become part of the pelvic mesh MDL because her "case [was] actually a hernia mesh case," not a pelvic mesh case. (Docket No. 29 at 2). As such, "very limited discovery was conducted in the MDL Court," and the United States District Court for the Southern District of West Virginia transferred the case to this Court on June 2, 2020. (Docket No. 29 at 2; Docket No. 18 at 4). The "parties agree[d] that [Yelinek's] case should be treated in the same manner as a newly filed case

despite being a [transferred] case from an MDL Court." (Docket No. 29 at 2). The parties proceeded to conduct discovery, with fact discovery ending in May 2021. (Docket No. 47).

Defendants brought the present motion for summary judgment on June 16, 2021. (Docket No. 52). Yelinek responded on August 2, 2021. (Docket No. 57). Defendants replied on August 16, 2021. (Docket No. 60). The Court held oral argument on September 16, 2021. (Docket No. 65). With briefing complete and oral argument held, the Court considers Defendants' motion fully briefed and ripe for disposition.

### IV. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015). Further, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A party seeking summary judgment always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145 (3d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a *genuine issue for trial*." *Santini*, 795 F.3d at 416 (internal

quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In this regard, the non-movant must come forward with more than "some metaphysical doubt as to the material facts." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 218 (3d Cir. 2015); *see also Matsushita*, 475 U.S. at 586-87. Rather, the non-movant "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Cosmetic Gallery, Inc. v. Schoeneman Corp.*, 495 F.3d 46, 51 (3d Cir. 2007) (quoting *Matsushita*, 475 U.S. at 587)).

In order to determine whether a genuine issue of material fact exists, the Court's analysis begins by a review of the parties' filings to determine the realm of potentially disputed facts. As such, all summary judgment filings must comply with Federal Rule of Civil Procedure 56, as well as this Court's companion Local Rule 56, both of which "allow facts to be deemed admitted where they are not properly opposed." *See Kelly v. DeJoy*, No. 19-204, 2021 WL 914207, at *4 (W.D. Pa. Mar. 10, 2021) (Hardy, J.); FED. R. CIV. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . consider the fact undisputed for purposes of the motion."); LCvR 56(E) ("[M]aterial facts set forth in the moving party's Concise Statement of Material Facts . . . which are claimed to be undisputed, will for the purposes of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party."). The parties' adherence to these rules is critical for determining whether summary judgment is appropriate. *See Kelly*, 2021 WL 914207, at *4; *Cuppett v. Rite Aid of Pennsylvania, Inc.*, No. 18-cv-14, 2019 WL 5310578, at *1 n.1 (W.D. Pa. Oct. 21, 2019) (Gibson, J.).

When filing their motion for summary judgment, Defendants' filed a concise statement of material facts. (Docket No. 55). In the statement, Defendants made twenty-six separately

numbered factual assertions. (Docket No. 55). In her counter concise statement of material facts, Yelinek admitted to twenty-four of the twenty-six assertions made by Defendants.[3] In the Court's view, given that Yelinek appears to agree that these twenty-four assertions are undisputed and given that Defendants supported the assertions with extensive citations to the record, the Court will deem these assertions as undisputed. The two assertions Yelinek disputed pertain to whether Dr. Angott removed all of Defendants' mesh during the December 12, 2008 surgery or just some of the mesh. (Docket No. 55 at ¶¶ 8-9; Docket No. 58 ¶¶ 8-9). As the Court sees it, whether Dr. Angott removed all or some of the mesh is immaterial to whether Yelinek was on notice that Defendants caused her injury through the implantation of their mesh product. Accordingly, the Court will assume that Yelinek is correct that some of the mesh remained after December 12, 2008. Nevertheless, the Court finds that there is no genuine dispute as to any material fact.[4] And as the undisputed facts make clear, Yelinek's suit is untimely under Pennsylvania law.[5]

---

[3]      In Yelinek's counter concise statement of material facts, Yelinek admitted, without qualification, to fourteen of Defendants' assertions. (Docket No. 58 at ¶¶ 1, 2, 3, 4, 5, 6, 7, 10, 12, 13, 14, 21, 22, 26). For eight of Defendants' assertions, Yelinek admitted the assertion "to the extent it portrays witness" testimony that is "a writing that speaks for itself." (Docket No. 58 at ¶¶ 16, 17, 18, 19, 20, 23, 24, 25). All of these assertions were quotes or paraphrases of deposition testimony. For two of Defendants' assertions, Yelinek admitted that the assertion was undisputed, but denied the assertion's materiality. (Docket No. 58 at ¶¶ 11, 15).

[4]      Yelinek also submitted three factual assertions in her counter concise statement of material facts. (Docket No. 58 at 3). In her first two assertions, Yelinek states, without citation to the record, that the mesh implantation on July 10, 2008 reduced her daily functioning and limited her medical treatment options. The Court considers these assertions immaterial to the present motion. Yelinek also asserted that "[p]rior to viewing the television commercials advertising biological mesh recalls, [she] did not have any knowledge, nor reason to believe, that the Prolene® Soft Mesh could have been defective and thus was the cause of her injuries." (Docket No. 58 at 3). This assertion has no supporting record citations and is conclusory in nature. As such, the Court will disregard it.

[5]      "As a federal court sitting in diversity, [the Court] must, . . . apply the relevant state's substantive law, which includes its statute of limitations." *Jaworowski v. Ciasulli*, 490 F.3d 331, 333 (3d Cir. 2007). The parties agree that Pennsylvania law applies. (*See* Docket No. 53 at 1-2;

## V. DISCUSSION

Pennsylvania law imposes a two-year statute of limitations for actions "to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct," including actions for "deceit or fraud." 42 PA. CONS. STAT. § 5524(7). Contract actions, such as breaches of express or implied warranties, face a four-year statute of limitations period. *Id.* § 5525. Lastly, all other "civil action[s]" face a six-year statute of limitations. *Id.* § 5527(b). All limitation periods run "from the time the cause of action accrued." § 5502(a). "In Pennsylvania, a cause of action accrues when the plaintiff could have first maintained the action to a successful conclusion." *Fine v. Checcio*, 870 A.2d 850, 857 (Pa. 2005). "Once a cause of action has accrued and the prescribed statutory period has run, an injured party is barred from bringing his cause of action." *Id.* But, "instances in which the causal connection between an injury and another's conduct is not apparent, the discovery rule may operate to toll the statute of limitations" until "the plaintiff discovers, or reasonably should discover, that she has been injured and that her injury has been caused by another party's conduct." *Wilson v. El-Daief*, 964 A.2d 354, 361-62 (Pa. 2009).

"Pennsylvania's formulation of the discovery rule reflects a narrow approach to determining accrual for limitations purposes and places a greater burden upon Pennsylvania plaintiffs vis-á-vis the discovery rule than most other jurisdictions." *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011). Under the Pennsylvania discovery rule, the limitations period commences with the "actual or constructive knowledge of at least some form of significant

---

Docket No. 57 at 2). Given that Yelinek sustained her injuries in Pennsylvania, the parties are correct that Pennsylvania law applies. *See, e.g.*, *Marks v. Redner's Warehouse Mkts.*, 136 A.3d 984, 990 (Pa. Super. Ct. 2016); *Kennedy v. Ethicon, Inc.*, No. 20-cv-185, 2020 WL 4050459, at *7 n.11 (E.D. Pa. July 20, 2020).

harm and of a factual cause linked to another's conduct, without the necessity of notice of the full extent of the injury, the fact of actual negligence, or precise cause." *Wilson*, 964 A.2d at 363-64. Accordingly, the discovery rule tolls the statute of limitations until a plaintiff knows, or, "exercising reasonable diligence," should have known that: (1) she was injured; and, (2) that the injury was caused by another. *Adams v. Zimmer US, Inc.*, 943 F.3d 159, 163 (3d Cir. 2019) (citing *Coleman v. Wyeth Pharms.*, 6 A.3d 502, 510-11 (Pa. Super. Ct. 2010)).

The "reasonable diligence standard is objective, as the question is not what the plaintiff actually knew of the injury or its cause, but what he might have known by exercising the diligence required by law." *Nicolaou v. Martin*, 195 A.3d 880, 893 (Pa. 2018). At the same time, the standard is "sufficiently flexible" to account for "the difference[s] between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." *Id.* at 888 (internal quotation marks omitted) (quoting *Fine*, 870 A.2d at 858). Under the "reasonable diligence" standard, "a plaintiff's actions are examined to determine whether the plaintiff demonstrated 'those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others.'" *Nicolaou*, 195 A.3d at 893 (quoting *Fine*, 870 A.2d at 858). In the context of a medical malpractice case, a plaintiff is generally not expected to possess more knowledge than her medical provider who provided treatment and diagnosis. *Nicolaou*, 195 A.3d at 893; *Wilson*, 964 A.2d at 365.

A determination of a plaintiff's "awareness of the injury and its cause is fact intensive, and therefore, ordinarily is a question for a jury to decide." *Wilson*, 964 A.2d at 362. "However, courts may resolve the matter at the summary judgment stage where reasonable minds could not differ on the subject." *Id.*; *see also Kennedy v. Ethicon, Inc.*, No. 20-cv-185, 2020 WL 4050459, at *19 (E.D. Pa. July 20, 2020); *Tily v. Ethicon, Inc.*, No. 20-2582, 2020 WL 5369724, at *6 (E.D. Pa.

Sept. 8, 2020). Lastly, "[t]he party relying on the discovery rule bears the burden of proof." *Wilson*, 964 A.2d at 362.

### A. Yelinek's Actual Notice of Her Injury and Its Cause

Turning to the application of Pennsylvania's statute-of-limitations law and precedent, the Court finds the following: Yelinek had notice that Defendants' mesh caused her injury on December 12, 2008 when Dr. Angott provided a diagnosis for her symptoms. Thus, the clock began to run on Yelinek's claims against Defendants on December 12, 2008. She had to bring her claims by December 12, 2014 under Pennsylvania's most generous limitations period, if not earlier. 42 PA. CONS. STAT § 5527(b). According, the complaint she filed on October 3, 2017 is untimely.

As an initial matter and as neither party disputes, Yelinek's cause of action accrued when Defendants' mesh product failed, which was no later than the December 12, 2008 surgery. (Docket No. 54-4 at 33; Docket No. 56 at 1). Dr. Taghizadeh implanted the mesh to repair the parastomal hernia on the right side of Yelinek's abdomen on July 10, 2008. (Docket No. 54-4 at 23; Docket No. 54-1 at 2). At some point after the July 10, 2008 surgery, Yelinek began to feel a burning sensation on the "insides of [her] stomach" and could feel "pinching at certain points" inside of her stomach. (Docket No. 54-4 at 24). As later determined by Dr. Angott on December 12, 2008, Defendants' mesh product had failed, causing Yelinek's symptoms. (Docket No. 54-3 at 13). At this point, assuming Yelinek's allegations are true, she did not need to wait for anything else to happen before she could bring a lawsuit against Defendants. In sum, she had a cause of action against the Defendants under all of her tort and contract theories: Defendant's mesh product failed and caused her injury. *Fine*, 870 A.2d at 857 ("[A] cause of action accrues when the plaintiff could have first maintained the action to a successful conclusion.").

Turning next to the application of the discovery rule, the record reflects that Yelinek's "first ever hernia-related procedure" occurred on July 10, 2008. (Docket No. 54-4 at 23). As stated previously, after the July 10, 2008 surgery, she began to experience a burning sensation on the "insides of [her] stomach" and could feel "pinching at certain points" inside of her stomach. (Docket No. 54-4 at 24). Importantly, Yelinek made clear that the burning and pinching symptoms were not related to the surgery per se. She estimated that the symptoms began "a month or so" after the July 10, 2008 surgery. (Docket No. 54-4 at 25). She explained that the symptoms were not the "normal burning sensations from surgery." (Docket No. 54-4 at 25). Instead, the symptoms occurred "after [she was] up and moving and everything," not "immediately after" the surgery. (Docket No. 54-4 at 25).[6]

Only a few months after the July 10, 2008 surgery, Yelinek sought treatment for her symptoms with Dr. Angott. In her testimony, Yelinek explained that Dr. Angott provided a cause for her pain: "He said that the mesh did - - it wasn't - - the mesh didn't hold up, it didn't work, whatever, I don't recall the exact words, but he said that it didn't work, it didn't hold up and he was to go in and repair." (Docket No. 54-4 at 24). Later in her testimony, Yelinek reiterated that Dr. Angott told her that "the previous [mesh] did not hold. It was, like, in a ball inside of me, that it did not adhere." (Docket No. 54-4 at 27). Nowhere in Yelinek's deposition did she qualify her words regarding what Dr. Angott told her. Further, Yelinek's medical records and Dr. Angott's testimony corroborate Yelinek's testimony. (Docket No. 54-8 at 2; Docket No. 54-3 at 7, 13). No other sources of information, medical or otherwise, offered Yelinek an alternative explanation for her newly developed symptoms.

---

[6]     The Court also notes that Yelinek did not sue Dr. Taghizadeh for injuries resulting from the July 10, 2008 surgery. (Docket No. 54-4 at 17).

After weighing the undisputed material evidence in a light most favorable to Yelinek, the Court finds that when Dr. Angott's explained to Yelinek that "the mesh didn't hold up, it didn't work," and the mesh was like a "ball inside of [her], that it did not adhere," Yelinek knew the cause of her injuries: she knew that the mesh had failed to remain attached to the fascia, and she had suffered pain as a result. (Docket No. 54-4 at 24, 27). Thus, on December 12, 2008, Yelinek knew that: (1) she was injured; and, (2) that the injury was caused by the mesh implanted inside of her. *Zimmer*, 943 F.3d at 163.

In this Court's opinion, Yelinek's notice of her injury does not require an examination of what a reasonable person should have known through exercising reasonable diligence. *See Nicolaou*, 195 A.3d at 890. Defendants do not need to surmount the reasonable diligence hurdle because Yelinek had *actual* notice of the cause of her injury, not just *constructive* notice. *See Kennedy*, 2020 WL 4050459, at *15. Yelinek's notice came directly from the surgeon who operated on her on December 12, 2008: Dr. Angott. Unlike many discovery-rule cases in the medical malpractice context, Yelinek did not face multiple potential causes for her injury. She made clear that the symptoms she experienced after her July 10, 2008 surgery were not the effects of recovering from surgery. Rather, Yelinek estimated that a full month separated her July 10, 2008 surgery and the onset of her symptoms. (Docket No. 54-4 at 25). Likewise, Yelinek could not (and did not) attribute the symptoms to another prior hernia procedure because her July 10, 2008 surgery was her first ever hernia-related procedure. (Docket No. 54-4 at 23). Lastly, Yelinek was not faced with two competing potential causes for her symptoms and left to determine which cause was the true culprit. Instead, Dr. Angott told her that the meshed failed or, in Yelinek's words, the mesh was like a "ball" inside of her, thus requiring Dr. Angott to remove the mesh and insert new mesh in its place. (Docket No. 54-4 at 27).

## B. Examination of Relevant Precedent

After a close examination of the relevant precedent, the Court finds that Yelinek's case is distinguishable from other medical malpractice cases involving the discovery rule. In *Adams v. Zimmer US, Inc.*, Marilyn Adams underwent hip replacement surgery to treat advanced degenerative arthritis. 943 F.3d at 162. Several years later, Adams experienced complications with her hip that required an additional surgery. *Id.* In a pre-operative visit on January 30, 2015, a doctor diagnosed Adams with "right total hip metallosis," meaning the artificial hip was experiencing metal wear that resulted in "a reaction to the surrounding tissues." *Id.* During the actual surgery on February 12, 2015, however, the doctor realized that Adams was not suffering from metallosis. *Id.* Instead, the metal pieces of the artificial hip were scraping together in a defective manner, leading to a discharge of "potentially toxic metal debris" in Adams' hip socket. *Id.* Adams sued on February 10, 2017 because of the defective scraping. *Id.* She filed her complaint within two years of the February 12, 2015 surgery but outside of two years from the January 30, 2015 pre-operative visit. *See id.*

The Third Circuit held that a reasonable jury could find that Adams was not on notice of the cause of the complications with her artificial hip until February 12, 2015. *See id.* at 165. The Third Circuit reasoned that Adams did not learn of the defective nature of her hip until the surgeon operated on her on February 12, 2015. On January 30, 2015, Adams was under the impression, based on what her doctor told her, that she was suffering from metallosis, not a defective hip implant. *See id.* Indeed, her own doctor was not on notice of the defective hip implant until the February 12, 2015 surgery. *See id.* at 166. Thus, the discovery rule tolled the statute of limitations until February 12, 2015, and Adams's suit was timely. *See id.* at 167-68.

The key fact in *Zimmer* was the doctor's inability to communicate the correct cause of Adam's pain until February 12, 2015. According to the Third Circuit, "[i]f Dr. Ververeli did not realize a problem with the implant was injuring Adams until the revision surgery, under Pennsylvania law Adams too cannot be charged with that constructive knowledge." *Id.* at 166. Other cases echo *Zimmer*'s reasoning. *See Wilson*, 964 A.2d at 365 (holding that the "asserted unwillingness or inability" of a plaintiff's medical doctor to "recognize injury or cause" and communicate the cause to the plaintiff precluded summary judgment because of the discovery rule); *In re Risperdal Litig.*, 223 A.3d 633, 641 (Pa. 2019) (reversing grant of summary judgment because plaintiffs were not diagnosed with the cause of their injury by their doctors until shortly before they filed suit); *Nicolaou*, 195 A.3d 880 at 895 (reversing grant of summary judgment because plaintiff "repeatedly and definitively" received the wrong diagnosis, thus precluding her from obtaining notice about the actual cause of her injury). In stark contrast to the situations in *Zimmer*, *Wilson*, *In re Risperdal*, and *Nicolaou*, Yelinek received a single, unqualified diagnosis for her pain from her doctor, and this diagnosis formed the basis for her suit: Dr. Angott told her that the mesh failed to adhere to the fascia of her abdomen on December 12, 2008. (Docket No. 54-4 at 24, 27).

In another fact pattern, illustrated by *Carlino v. Ethicon, Inc.*, courts have denied summary judgment because of the discovery rule when a plaintiff could mistake the effects of surgery as the cause of pain. *Carlino* involved a defective pelvic mesh product "eroding" and leading to Sharon Carlino's injury. 208 A.3d 92, 99-101 (Pa. Super. Ct. 2019). After the mesh was implanted into Carlino's vagina, she began to experience sharp pain. *Id.* at 99. In response, she underwent surgery in both 2007 and 2010 to "revise the mesh." *Id.* at 100-01. In both the 2007 and 2010 surgeries, Carlino's doctors advised her that the surgery itself could cause mesh erosion rather than the

mesh's defective nature leading to its erosion. *See id.* at 100-01. After viewing a commercial regarding mesh recalls in 2013, Carlino sued the mesh manufacturer for producing a mesh that would erode and cause her pain. *Id.* at 101. The Pennsylvania Superior Court held that because Carlino's doctors told her that surgery itself could lead to mesh erosion, the 2007 and 2010 surgeries did not put her on notice of the cause of her injury. *See id.* at 106-07. *Carlino* followed *Fine v. Checcio*, where the Pennsylvania Supreme Court held that a plaintiff's symptoms, including facial numbness, were a natural result of either oral surgery or a negligent action taken during the oral surgery. 870 A.2d at 272 ("Facial numbness was either a temporary physical consequence that resulted from the very nature of the procedure that Dr. Checcio performed on Fine or it was a manifestation of Fine's injury, a permanent condition that resulted from underlying nerve damage.").

Unlike in *Carlino* or *Fine*, Yelinek testified that the burning sensation she experienced, which ultimately led to the December 12, 2008 surgery, was not the "normal burning sensation[] from [the July 10, 2008] surgery." (Docket No. 54-4 at 25). She estimated that the burning sensation began a month after the July 10, 2008 surgery, thus eliminating the possibility that she confused the effects of surgery with the pain she felt from the mesh. (Docket No. 54-4 at 25). Indeed, she never claimed that she thought the pain she was experiencing was a result of undergoing the July 10, 2008 surgery. Thus, Yelinek's case is distinguishable from *Carlino* and *Fine*.

The Court finds *Kennedy v. Ethicon, Inc.* from the Eastern District of Pennsylvania persuasive in how to address the present situation. Ramona Kennedy underwent surgery in which a surgeon implanted a pelvic mesh product into Kennedy's vagina to treat a bladder condition. 2020 WL 4050459, at *2. Like Yelinek here, Kennedy did not suffer any immediate post-operative

complications from the surgery. *Id.*; (Docket No. 54-4 at 25). Several months after the procedure, Kennedy began to experience abdominal pain and consulted a urologist. *Kennedy*, 2020 WL 4050459, at *3. The urologist performed a CT scan, discovered a bladder stone, and concluded that the bladder stone was probably a result of mesh erosion. *Id.* On May 4, 2011, the urologist performed surgery to remove the bladder stone and excised exposed mesh near the stone. *Id.* Similar to Yelinek's deposition testimony regarding Dr. Angott, Kennedy testified in her deposition that the urologist told her about the bladder stone and that the mesh erosion caused the bladder stone. *Id.* at *4-5; (Docket No. 54-4 at 24, 27). Based on her conversation with the urologist, Kennedy "attributed" her injury to the mesh. *Id.* at *4-5.

After a careful review of the relevant law and facts, the court in *Kennedy* concluded that the discovery rule ceased to toll the limitations period on May 4, 2011, as demonstrated by Kennedy's deposition and medical records. *Kennedy*, 2020 WL 4050459, at *14. The court emphasized that regardless of what Kennedy "should have known," Kennedy "had *actual* knowledge of her injuries and a causal connection to her pelvic mesh" after the May 4, 2011 surgery. *Id.* Kennedy's "plain words" established when she learned of her injury and its cause. *Id.* The court took pains to note that unlike in some discovery-rule precedent, Kennedy "had not experienced" her symptoms after surgery, but instead began to experience the symptoms several months later. *Id.* at *16. Additionally, Kennedy's urologist had no doubt about the cause of Kennedy's pain and provided Kennedy with a single explanation for the pain: the mesh erosion. *Id.* at 17 ("Dr. Harris directly connected Kennedy's conditions to the eroding pelvic mesh.").

Just like in *Kennedy*, Yelinek's undisputed "plain words" and medical documentation show that Dr. Angott gave her a single diagnosis for the pain she was experiencing after her July 10, 2008 surgery: the mesh attached to the fascia on her abdominal wall did not "adhere." (Docket No.

54-4 at 27); *see also Tily*, 2020 WL 5369724, at *5 (explaining that a plaintiff's deposition testimony demonstrated actual notice of her injury when Plaintiff testified that she "believed that her pain and numerous other symptoms were attributable to her TVT mesh implant"). Thus, following the persuasive reasoning of *Kennedy*, the Court finds that Yelinek's limitations period began to run on December 12, 2008.

### C.  Yelinek's Asserted Time Period for Notice

The Court believes two additional matters regarding Yelinek's knowledge about her cause of action require further discussion. In her deposition, Yelinek asserted that she first had the idea to sue after watching a commercial on television regarding mesh product recalls. (Docket No. 54-4 at 33). Initially, the Court notes that Yelinek could not remember when she saw this commercial. (Docket No. 54-4 at 33). As the Court sees it, the commercial could have occurred well outside the statute of limitations period. In any event, Yelinek later testified that she considered bringing a lawsuit before she saw the commercial, thus demonstrating that Yelinek had notice of her claim at some point before seeing the commercial. (Docket No. 54-4 at 34). Regardless of these problematic facts, Yelinek's argument that she had no notice of her claim until viewing the commercial fails because the discovery rule inquiry is not when the idea to sue entered a plaintiff's mind. Instead, Pennsylvania law simply asks when the plaintiff knew that she was injured and when she knew the cause of the injury. *Burton-Lister v. Siegel*, 798 A.2d 231, 237 (Pa. Super. Ct. 2002) ("[T]he fact that a plaintiff is not aware that the defendant's conduct is wrongful, injurious or legally actionable is irrelevant to the discovery rule analysis." (internal quotation marks omitted) (quoting *Haggart v. Cho*, 703 A.2d 522, 528 (Pa. Super Ct. 1997))). Pennsylvania law does not ask when it first dawned on a plaintiff that she could recover damages for her injury. *See id.* Here,

Yelinek knew that the mesh caused her symptoms by December 12, 2008. That she did not think to sue someone for her injuries until some point after December 12, 2008 makes no difference.

Aside from the commercial, Yelinek stated in her "fact sheet," filed as part of her suit, that she was "not sure when she first attributed her injuries to the . . . mesh product." (Docket No. 8 at 7). She continued, "[s]ometime during her treatment for one of the multiple infections, she remembers someone mentioning that the mesh could have contributed to the infections, but [she] cannot recall which provider or when this may have happened." (Docket No. 8 at 7). The only infection apparent from the record is one that Dr. Angott treated on April 15, 2015 when he performed surgery to remove infected mesh from a hernia that had developed on the right side of Yelinek's abdomen. (Docket No. 54-12 at 2). The treatment for this infection occurred more than two years before Yelinek filed suit against Defendants on October 3, 2017. Assuming Yelinek obtained notice for discovery rule purposes on April 15, 2015, her suit would be untimely under Pennsylvania's two-year limitations period applicable to tortious conduct. 42 PA. CONS. STAT. § 5524(7). Regardless, while Yelinek might have "first attributed" her injuries to Defendants' mesh at some point around April 15, 2015, Dr. Angott directly told her about the cause of her injuries on December 12, 2008 as explained previously. She could have "attributed" her injuries to the mesh in December 12, 2008 with the information Dr. Angott gave her on that date, and thus the discovery rule ceased tolling the statute of limitations on December 12, 2008.[7]

---

[7]   Yelinek also raises the doctrine of fraudulent concealment as a means of tolling the statute of limitations. (Docket No. 57 at 5). But, as the Third Circuit has held, "the inquiry under the fraudulent concealment doctrine is the same as that under the discovery rule." *Bohus v. Beloff*, 950 F.2d 919, 926 (3d Cir. 1991). If a plaintiff has actual knowledge of her injury and the cause of her injury, then the fraudulent concealment doctrine does not toll the statute of limitations. *Id.* To reiterate, Yelinek had actual knowledge of her injury and its cause on December 12, 2008, so her claim is untimely under the fraudulent concealment doctrine.

To conclude, Yelinek's cause of action accrued no later than December 12, 2008. Further, Yelinek had actual notice of her cause of action by December 12, 2008. The statute of limitations period therefore expired on December 12, 2014 under the most generous limitations period Pennsylvania provides. Thus, Yelinek's suit, filed on October 3, 2017, is untimely.

## VI. CONCLUSION

Based on the foregoing, the Court finds that no genuine issue as to any material fact exists and Defendants are entitled to judgment as a matter of law. Accordingly, Defendants' Motion for Summary Judgment [52] is hereby GRANTED. An appropriate order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

Date:   October 19, 2021

cc/ecf:  All counsel of record.